On the trial several witnesses were examined, whose testimony was substantially as follows: The deceased and the prisoner had, for the last twelve months, been upon bad terms; had had several disputes, and on one occasion a rencounter, in which both parties drew their knives; the prisoner during the last summer had said that unless the deceased quit troubling him he would take his life; on the week before the (630) affair the prisoner had procured a knife twelve inches in length, and said he expected yet to kill some person with it; on Saturday, 28 September, the prisoner went to the house of one Edwards, much intoxicated, and slept for some hours; on the same day the deceased went to the same place also, intoxicated. Something was said about shooting, and the deceased applied to the prisoner as well as to others to borrow money, which the prisoner refused. They were in a room to themselves when the deceased passed through another room, the prisoner following, and both having their knives drawn, which, however, they put up, not evincing, as the witness thought, any disposition to use them. Both parties shortly after this went out at the side door of the house, the deceased first, and the prisoner following after. Shortly afterwards the deceased was seen going into the house at the end door, when the prisoner caught hold of his waistcoat and pulled him back, and said, "Let us talk it over," to which the deceased made no reply that could be heard. The prisoner then struck him, upon which the deceased pulled out his knife, as one of the witnesses thought, open, and gave three cuts, one lightly across the prisoner's arm and the others pretty severely in the abdomen, the prisoner giving back and pushing the deceased from him. The prisoner then jumped off, pulled out his knife and opened it, exclaiming "Damn him, he has killed me, and I will kill him, if I can"; he then advanced five or six steps and gave a thrust with great force, which proved fatal — the deceased dying the next day. The whole transaction occurred in a few minutes. The witnesses differed as to the position of the deceased at the time he was stabbed; but all of them concurred in saying that he was standing still, and manifesting no inclination to pursue the prisoner or to renew the combat. The deceased was upwards of forty years of age, and a turbulent man; the prisoner was about twenty-three years of age, of equal manhood with the *Page 497 
deceased; and both were addicted to intoxication. The cause was submitted to the jury, on the Thursday of court, as a case either of excusable homicide, murder, or manslaughter. The jury being unable to agree, asked for further instructions as to the law, when his Honor gave the following in writing: (631)
"Excusable Homicide. If the prisoner brought on the affray by making the first attack, he was bound not only to have ceased the combat, but to have used every means in his power, short of taking away the life of the deceased, such as retreating, unless the attack on him had been so fierce that a retreat would have increased his danger.
"Murder. A killing with malice, without any just cause or excuse.
"First. If the prisoner sought the provocation, by giving the first blow, in order to afford him a pretense for wreaking his vengeance, or with the design of using his knife, it is a case of murder.
"Secondly. If the prisoner gave the first blow, and was then cut by the deceased, although he may have been agitated by resentment and anger, yet if the jury collect from what he said and did, when or just before he gave the mortal blow, that in fact he was possessed of deliberation and reflection, so as to be sensible of what he was then about to do, and intentionally did the act, it was a case of murder.
"Manslaughter. A killing without malice express or implied, and under the influence of passion or provocation.
"Should the jury think, according to the first proposition, that the prisoner did not seek the provocation with any view to revenge; or, according to the second, was not possessed of deliberation and reflection at the time he gave the blow, but acted under the influence of passion, excited by the provocation then received, it would be a case of manslaughter."
The jury returned a verdict of guilty, and sentence of death being pronounced upon the prisoner, he appealed.
From the case which has been stated by the judge who presided at the trial, and which constitutes a part of the record before us, it appears that it was not controverted but that the prisoner had committed the homicide wherewith he was charged, and that the only question was as to the degree of guilt which the law (632) attached to the fatal deed. Upon this question the jury doubted, and asked for specific instructions; and it was to enable them to come to a correct conclusion upon this question that the specific instructions set forth in the case were given. It is not for us to determine whether the *Page 498 
verdict was warranted by the evidence, but it is our duty to examine whether the law was correctly expounded.
In the investigation of this question it was necessary that the jury should, in the first place, ascertain whether the prisoner commenced the affray with a preconceived purpose to kill the deceased or to do him great bodily harm. For if he did, then there was nothing in the subsequent occurrences of the transaction which could free him from the guilt of murder. If the first assault was made with this purpose, the malice of that assault, notwithstanding the violence with which it was returned by the deceased, communicates its character to the last act of the prisoner. It is laid down as settled law that if a man assault another with malice prepense, even though he should be driven to the wall, and kill him there to save his own life, he is yet guilty of murder in respect of his first intent. Hawkins Book 1, ch. 11, sec. 18, and ch. 13, sec. 26. Of that part, therefore, of his Honor's instructions which in the case is called "the first proposition," and which declared as a conclusion of law that the prisoner was guilty of murder, if the jury were satisfied from the evidence that the assault was made by him in order to have a pretense to kill the deceased, or to cut him with the knife, the prisoner has no cause to complain. Such craft, indeed, would but the more strongly indicate the heart fatally bent on mischief.
There was certainly evidence well deserving to be weighed by the jury in coming to a correct conclusion upon this inquiry. But what was that conclusion we have not the means of knowing. They might have believed, notwithstanding the testimony as to antecedent quarrels, and the rencounter between the parties, and in relation to threats of vengeance by the prisoner, that the transaction which they were then examining sprang from the passions of the moment. For (633) certainly where two persons have formerly fought on malice, and are apparently reconciled, and fight again on a fresh quarrel, it shall not be intended that they were moved by the old grudge, unless it so appear from the circumstances of the affair. Hawkins B. 1, ch. 13, sec. 30. If, upon consideration of all the evidence, the jury came to the conclusion that the first assault of the prisoner was not of malice prepense, then the subsequent occurrences demanded their careful consideration, because upon these the prisoner's guilt might be extenuated into manslaughter or excused as a homicide in self-defense.
So much of the instructions given upon this view of the case as relate to excusable homicide is, in our opinion, not liable to exception. Even if the prisoner had not begun the affray, but had been assaulted in the first instance, and then a combat had ensued, he could not excuse himself as for a killing in self-defense unless he had quitted the combat before a mortal blow was given, if the fierceness of his adversary *Page 499 
permitted, and retreated as far as he might with safety, and had then killed his adversary of necessity to save his own life. But the remaining part of the instructions, and that part which may have had a decisive influence upon the verdict, is, in our judgment, erroneous. According to this, which is laid down as "the second proposition," the jury were instructed "that if the prisoner gave the first blow, and was then cut by the deceased, although he might have been agitated by excitement and anger, yet if they collected from what he said and did, when or just before he gave the mortal blow, that in fact he was possessed of deliberation and reflection, so as to be sensible of what he was then about to do, and did the act intentionally, it was murder." This proposition, as we understand it, and as we must believe it to have been understood by the jury, we are very confident cannot be sustained.
The proposition supposes that the first assault was made by the prisoner without malice, and that the fatal wound was given while under the influence of indignation and resentment, excited by the excessive violence with which he had been in turn assailed by the deceased; but it refuses to the prisoner the indulgence which the law accords to human infirmity suddenly provoked into passion, if such (634) passion left to him so much of deliberation and reflection as to enable him to know that he was about to take, and to intend to take, the life of his adversary. No doubt can be entertained, and it is manifest that none was entertained, by his Honor but that the excessive violence of the deceased, immediately following upon the first assault, constituted what the law deems a provocation sufficient to excite furious passion in men of ordinary tempers. The case does not state that the first blow given by the prisoner was such as to endanger life or to threaten great bodily harm, nor that it was immediately followed up by further efforts or attempts to injure the deceased. It must be taken to have been a battery of no very grievous kind, and it justified the deceased in resorting to so much force on his part as was reasonably required for his defense — and in estimating the quantum of force which might be rightfully thus used the law will not be scrupulously exact. But when an assault is returned with a violence manifestly disproportionate to that of the assault, the character of the combat is essentially changed, and the assaulted becomes in his turn the assailant. Such, according to the case, was the state of this affray when the mortal wound was given. To avenge a blow, the deceased attacked the prisoner with a knife — made three cuts at him — and gave him a severe wound in the abdomen. If instantly thereupon, in the transport of passion thus excited, and without previous malice, the prisoner killed the deceased, it would have been a clear case of manslaughter. Not because the law supposes that this passion made him unconscious of what he was about to do, and stripped *Page 500 
the act of killing of an intent to commit it, but because it presumes that passion disturbed the sway of reason, and made him regardless of her admonitions. It does not look upon him as temporarily deprived of intellect, and therefore not an accountable agent, but as one in whom the exercise of judgment is impeded by the violence of excitement, and accountable therefore as an infirm human being. We nowhere find that the passion which in law rebuts the imputation of malice must be so overpowering as for the time to shut out knowledge and destroy volition. All the writers concur in representing this indulgence of the law (635) to be a condescension to the frailty of the human frame which, during the furor brevis, renders a man deaf to the voice of reason, so that although the act done was intentional of death, it was not the result of malignity of heart, but imputable to human infirmity.
The proper inquiry to have been submitted to the jury on this part of the case was whether a sufficient time had elapsed after the prisoner was stabbed, and before he gave the mortal wound, for passion to subside and reason reassume her dominion — for it is only during the temporary dethronement of reason by passion that this allowance is made for man's frailty. And in prosecuting this inquiry, every part of the conduct of the prisoner, as well words as acts tending to show deliberation and coolness on the one side, or continued anger and resentment on the other, was fit to be considered in order to conduct the jury to a proper result.
The Attorney-General, in his argument, referred to a class of cases which probably misled the judge in laying down the proposition before us — in which circumstances apparently unimportant, but indicative of deliberation, have been thought to establish malice and repel the plea of human infirmity. The explanation given by the text writers will show that the doctrine in these cases, although in some respects analogous to that which obtains in a killing upon legal provocation, is not identical with it. The general rule of law is that words of reproach or contemptuous gestures, or the like offenses against decorum, are not a sufficient provocation to free the party killing from the guilt of murder, where he useth a deadly weapon or manifests an intention to do great bodily harm. This rule, however, does not obtain where, because of such insufficient provocation, the parties become suddenly heated and engage immediately in mortal combat, fighting upon equal terms. But deliberate dueling, if death ensue, however fairly the combat may be conducted, is, in the eye of the law, murder. The punctilious of false honor the law regards as furnishing no excuse for homicide. He who deliberately seeketh the blood of another, in compliance with such punctilious, acts in open defiance of the laws of God and of the State, and with that wicked purpose which is termed malice aforethought. *Page 501 
While, therefore, because of presumed heat of blood the law (636) extenuates into manslaughter a killing upon such sudden rencounter, although proceeding upon an insufficient provocation, it withholds this indulgence when, from the circumstances of the case, it can be collected that, not heated blood but a settled purpose to vindicate offended honor, even unto slaying in defiance of law, was the actual motive which urged on to the combat.
In the conclusion of his instructions the judge informed the jury "that if they should believe, according to the second proposition, that the prisoner was not possessed of deliberation and reflection at the time he gave the mortal blow, but acted under the influence of passion excited by the provocation then received, it would be a case of manslaughter." It is manifest that if there was error in the proposition which we have been examining, this general instruction did not correct it, for the jury were expressly referred to that proposition for the legal meaning of "deliberation and reflection"; and according to that proposition there was deliberation and reflection, "if the prisoner was sensible of what he was about to do, and did the act intentionally."
Entertaining a full conviction that in this the jury were misdirected, we are of opinion that the verdict below ought to be set aside, and avenire de novo awarded. This decision must be certified to the Superior Court of Wake, with directions to proceed agreeably thereto and to the laws of the State.
PER. CURIAM. Judgment to be reversed.
Cited: S. v. Gentry, 47 N.C. 412; S. v. Carter, 76 N.C. 23; S. v.Chavis, 80 N.C. 357; S. v. Barnwell, id., 470; S. v. Kennedy, 91 N.C. 578;S. v. Hensley, 94 N.C. 1035; S. v. Whitson, 111 N.C. 699; S. v.Ham, 116 N.C. 1046; S. v. Medlin, 126 N.C. 1130.
(637)