STATE v. THOMAS BOON.

*Homicide—Jury—Trial—Evidence of near relations—Judge's Charge.*

1. An alleged irregularity in the formation of a jury cannot be taken advantage of after verdict.

2. Upon disagreement of counsel as to facts testified to by a witness, it is not error in the court to have the witness re-examined, especially when in the charge the jury are told that they must be guided by their own recollection of the testimony.

3. The credit of a witness related to the party for whom he testifies is

thereby affected, and his evidence must be received with some degree of allowance. But if from his testimony and the other facts and circumstances in the case, the jury believe he has sworn the truth, he is entitled to as full credit as any other witness.

4. The language of a judge in his charge to the jury must be read with reference to the evidence and points in dispute, and construed in reference to the context—approving *State* v. *Tilly*, 3 Ired., 424. Abstract propositions of law not applicable to the case should not be laid down. Nor is a judge in giving an instruction required to adopt the words of the prayer; a substantial compliance is sufficient.

5. The degree of homicide is murder where the prisoner acts coolly and vengefully or with violence out of all proportion to the provocation; and this, whether there be "cooling time" or not; *Therefore*, in an altercation about the payment of an alleged debt, the deceased promising to pay when he got the change, the prisoner threatening to whip him if he did not do so then and there; deceased, unarmed, remonstrated with prisoner and expressed friendship for him; a fight ensued in which deceased was knocked down; they were separated and deceased went off; prisoner at the request of a witness put up his pistol which had been drawn, promising to do no more, followed and overtook deceased and engaged in another fight, deceased crying out "hold him off me," and killed deceased with a deadly weapon; *Held*, to be murder.

(*State* v. *Ward*. 2 Hawks, 443; *Boon*, 80 N. C., 461; *Davis*, *Ib.*, 412; *White*, 68 N. C., 158; *Ellington*, 7 Ired., 61; *Tilly*, 3 Ired., 424; *Scott*, 64 N C., 586; *Brantley*, 63 N. C., 518; *Burton* v. *March*, 6 Jones, 409; *State* v. *Chavis*, 80 N. C., 353; *Curry*, 1 Jones, 280; *Scott*, 4 Ired., 409; *Hildreth*, 9 Ired., 440, cited and approved.)

INDICTMENT for Murder removed from Yancey and tried at Spring Term, 1879, of MADISON Superior Court, before *Gudger, J.*

The prisoner was charged with the murder of one Samuel Butner, and from the statement of the case, the following substantially appears: The clerk was directed to furnish prisoner's counsel with a list of the names of the special *venire*, the names of four of whom were by mistake of the clerk left out of the box. Upon suggestion of prisoner's counsel that the names of these four had not been called,

the court directed them to be put in the box and drawn. The prisoner made no exception at the time other than to suggest they had not been called. But after the trial he excepted to the alleged irregularity.

Ten jurors of the special *venire* were stood aside, and in selecting the jury, their names were called from the list in the order in which they had been drawn, and disposed of by the state and the prisoner, the prisoner accepting one of them, who completed the panel. After the verdict, the prisoner excepted, for that the names were not placed in the box and drawn a second time.

John A. Black, for the state, testified that in June, 1878, he went to the bar-room or grocery (where the alleged murder was committed) and soon after he got there the prisoner, the deceased, and some others came there. It was late in the afternoon, and the party were drinking, and after the shop-keeper had closed, they started off. Upon some one's proposing to get more brandy, the deceased said, with an oath, "I've got the money." "Yes, and you know how to keep it," said one of the party. Prisoner then said to deceased, "As you have so much money, pay me what you owe me." Deceased replied, he did not think he owed him anything; if he did, he would pay it when he got the change, and asked the amount, when, after some calculation, the prisoner answered, "five cents," and said he could change the bill of money. After some talk about paying the money, prisoner said, "pay me right here, or I'll whip you." Deceased said he was a friend of prisoner, and did not want any "fuss." Prisoner took hold of deceased; witness separated them, but prisoner got hold of him again, and a fight ensued, the prisoner knocking deceased down, and getting on him on the ground, when they were separated again. Prisoner drew a pistol, and threatened to shoot deceased. Deceased got up and walked off towards the grocery, witness holding prisoner, and trying to get the pistol. Prisoner promised to put his pistol in his pocket, if witness would let him go.

Prisoner then put up his pistol, and also went towards the grocery. Witness soon heard fighting in the direction of the grocery, and on arriving there found the parties fighting again, but deceased was not striking back, and witness did not see what prisoner was striking with. Prisoner was holding deceased with his left hand and striking with his right hand. He attempted to separate them, and said to prisoner, "You ought not to have done this; you have killed Sam," (deceased). Prisoner said "no, I haven't hurt him." Deceased was very bloody. When the blows were struck, witness heard a noise like "a rip" in cloth. It was a cloudy night, but some moon-light. Witness told deceased to get out of the way, and deceased thereupon ran across a creek near by, and fell. When witness got to him he was lying on his back. Prisoner and others came up soon after, and in reply to a remark of witness that Butner was killed, the prisoner said, "he is lying there drunk." A physician was sent for, and in a few minutes they carried the deceased to a mill, on the creek, not far off, and when they got there he was dead. He was cut in the neck, throat, breast and shoulder. On cross-examination the witness stated that both of the parties had been drinking; that before the first fight, deceased said to prisoner that some months before he had got insulted at deceased, and prisoner asked, "Do you intend to insult me?" and deceased replied, "I do not;" that it was a very short time between the two fights; about forty yards from the place where the first occurred to the grocery where the second took place. During the fight the deceased got prisoner by the throat, and held on until witness separated them; prisoner's ear was bleeding a little; no other injury to him; he did not complain of being hurt. Several other witnesses (among them one Hicks) were examined for the state, whose testimony is substantially that of the first witness, and tending to show that at the first fight the deceased remonstrated with the prisoner, telling

him to let him alone, and saying that he was a friend to prisoner, and that deceased, during the difficulty, twice said, " Oh Lord, boys, hold him off me."

A medical expert testified that he was called to see the deceased, and on examination found four wounds; the first, a cut across the heart which penetrated to the cavity, sufficiently large to allow the witness to introduce his hand and lift up the heart; the heart had a shallow incision in it; the second was above the heart, and struck the breast bone; the third, a little above the second, and penetrated the cavity of the body; the fourth, on the neck, commencing at the ear and coming down to the throat, and in the cavity of the throat, about two inches in length, severing the jugular vein; the wounds at the heart and throat were sufficient to produce death. The prisoner admitted that the wounds described caused the deceased's death.

Jane Carroll, a niece of prisoner, testified in his behalf, that she saw him on the night of the murder; his head was badly cut on the right side near the top, also a gash over his left temple, and scratched places on his throat, resembling prints of fingers; the cut on the top of the head looked as if it had been done by a rock; the prisoner remained in the house (his father's where witness was) about an hour, changed his clothes, but did not have his wounds dressed; his clothes were bloody. Caroline Hensley, a sister of the prisoner, also testified that he was wounded as described by last witness, but that the wounds had not been dressed; saw prisoner again two weeks afterwards; the prints were on his throat then, but did not examine his head. And the evidence of a brother-in-law of prisoner was substantially the same as that of the witness Jane Carroll.

Samuel Boon, the father of the prisoner, testified that he examined his wounds the morning after the homicide; his throat was choked; one cut near the top of his head, an

inch or more long; one near the right ear, and one in the temple, not so bad as that on the top of prisoner's head.

Samuel Parrott testified for the prisoner, that he saw him on the night of the killing at his (prisoner's) father's, Samuel Boon; went with him to the house; there was some blood on his head, a little place of blood there. On cross-examination, he stated that he was at the grocery on the night of the fight, and Johnson (the shop keeper) closed up his bar and went to supper; does not remember who were present except the prisoner, the deceased, Black, (the first witness) one Wilson and himself; they went up the road to meet the bar-keeper; prisoner wanted deceased to pay him what he owed him; some quarreling occurred; prisoner took hold of deceased, pulled him about, and struck him; a fight took place between them; they were separated, and deceased walked down the road; the prisoner had his pistol, and Black told him to put it up; prisoner said let me go, "I won't do any more, and will put it up." At the first fight the deceased said he did not want any "fuss"; when witness got to the second fight, prisoner was striking deceased; Black took hold of the prisoner and told deceased to get away, and deceased ran off up the creek, and after crossing it, fell; when they got to deceased, Black said, "go for a doctor," and the prisoner said, "Parrott will go with me"; the prisoner did not complain of being hurt; witness did not see blood or wounds on prisoner, till he got home; saw the place on top of his head, but did not see other wounds, nor scratches on his throat.

It was admitted that the killing was with a deadly weapon, and there was not sufficient "cooling time" between the fights. There was also evidence tending to show that the party had started to go up the road to their homes.

During the argument, a disagreement arose between counsel as to what was sworn to by one of the witnesses, and the court directed the witness to be re-called. He then re-stated

his testimony upon the point in dispute, and neither side was permitted to interrogate him. The prisoner excepted to the re-calling of the witness.

The court told the jury that its rehearsal of the testimony was to aid them, but not conclusive as to what the witnesses said; their own recollection of the testimony should guide them and then; proceeded to charge,

1. Upon a trial for murder, the fact of killing with a deadly weapon being proved or admitted, (and here, it is admitted) the burden of showing matter of mitigation is thrown upon the prisoner, unless it arises out of the testimony produced against him. It is incumbent on him to establish such matter, neither beyond a reasonable doubt, nor by a preponderance of testimony, but to the satisfaction of the jury. Homicide is murder unless attended with extenuating circumstances which must appear to the satisfaction of the jury, and if they are left in doubt on this point, it is still murder. If the prisoner in this case has satisfied the jury he did the act, of necessity, it would make a case of self-defence; if in the heat of blood arising from sudden passion, it would mitigate the offence to manslaughter; but if he has failed so to do, the jury should return a verdict of guilty of murder. Matter of mitigation may appear from the state's evidence or that offered for the defence, but in either case, it was for the prisoner to satisfy the jury of the matters of mitigation or excuse.

2. If the jury find that deceased was unwilling to fight, and if prisoner attacked him, got him down, and they were separated and prisoner got hold of him again, and they were again separated, and prisoner drew his pistol, and being induced by those present so to do, put up his pistol, and then followed the deceased, attacked, and killed him, it is murder.

3. If prisoner struck deceased in the first fight, got him down and got on him, the deceased was justified in defend-

ing himself by choking or otherwise, and such fighting in self-defence would be no provocation for the prisoner in the second fight.

4. That if deceased got away from prisoner at the first fight, and had been told to run and did go down the road, and if he saw the prisoner approaching him soon after, and if he knew the prisoner was armed from his having a pistol, and from these facts, if the jury find them true, the deceased had reasonable ground to believe and did believe that prisoner intended to attack him with the pistol or other deadly weapon, he (deceased) had the right to arm himself with a rock; and if prisoner attacked him with a knife, he had the right to fight back, and if prisoner killed deceased, it is murder.

5. It is true as a general rule, that where two men meet and fight on a sudden quarrel, no advantage being taken, and one kill the other with a deadly weapon, it will be but manslaughter, and it matters not which struck the first blow. The law presumes malice in every wilful killing, and it is the provocation given in the mutual combat that extenuates the offence to manslaughter; therefore in a killing upon a sudden quarrel, the grade of the offence depends upon the character of the provocation; if the provocation be great, the offence is but manslaughter; but if slight, and the killing be done with a degree of violence out of all proportion to the provocation, it is murder.

To these propositions of law, as charged by the court, the prisoner excepted, and requested the following instructions:

*First.* From all the facts and circumstances, disclosed by the evidence in this case, there is no element of murder in it; that the injuries inflicted upon the prisoner by the deceased in the first fight were a great and grievous provocation, and if the mortal blows were given after the first fight by the prisoner within the time and in the manner disclosed

by the evidence, then this is but a case of manslaughter. Refused and prisoner excepted.

*Second.* That the grade of homicide depends on the character of the provocation, and prisoner being in a state of great provocation at the moment of the act done, the number and violence of the blows inflicted upon deceased, and the use of the knife as disclosed by the evidence, do not make out a case of *unusual* killing, and do not necessarily imply malice. The court declined to give this instruction in the language requested, but charged the jury that the grade depends upon character of provocation, and if prisoner was in a state of great provocation at the moment of the act done, and if there had been a mutual combat, and a sudden quarrel, the number and violence of the blows inflicted upon deceased and the use of the knife as disclosed by the evidence, do not make out a case of unusual killing and do not necessarily imply malice.

*Third.* If prisoner were in a state of great provocation at the time of the homicide, then the degree of violence used by him or the number of blows inflicted, could not have been out of all proportion to that provocation, and they form no proper element of the grade of the prisoner's offence. Declined in the language used, but charged as follows: If there had been a mutual combat on a sudden quarrel, and if prisoner was in a state of great provocation at the time of the homicide, then the degree of violence used by him or the number of blows inflicted, could not have been out of all proportion to that provocation, and they form no proper element of the grade of prisoner's offence.

*Fourth.* If in the progress of a fight begun on a sudden quarrel in which prisoner was the aggressor, he receives severe injuries calculated to place him in a state of legal provocation, and acting upon that provocation he slays his adversary with a deadly weapon, it is but manslaughter. Declined as requested, but charged as follows: If in the

progress of a fight begun on a sudden quarrel in a mutual combat the prisoner receives severe injuries calculated, &c., it is but manslaughter.

*Fifth.* As to the testimony of near relations, the prisoner requested the court to charge: That the rule which regards the testimony of near relations with suspicion, is not a rule which rejects such testimony or necessarily impeaches it; but if from that testimony, or from it and other facts and circumstances in the case the jury believe that such near relations have sworn the truth, then they are entitled to as full credit as any other witness. This the court modified as follows: The rule of law as insisted on by the state is that such evidence must be taken with some degree of allowance, and the jury should not give it the same weight as that of disinterested witnesses; but the rule which regards it with suspicion does not reject it or necessarily impeach it, &c., (following the words of the request). To these refusals, and the propositions as modified by the court, the prisoner excepted.

The judge also charged the following, some of which at the request of prisoner, and the others not excepted to: If the prisoner pursued deceased, smarting under injuries received and within four minutes after their separation in the first fight, and killed him, it is but manslaughter. If he met deceased by accident and a mutual combat ensued in which he received two severe wounds on the head from a rock or other deadly weapon, no one being present who saw the beginning of the fight, and he killed deceased, it is manslaughter. If two men fight on sudden quarrel, whether each is willing to fight or not at the commencement of the quarrel, and one be killed, it is manslaughter, though the death is caused by use of a deadly weapon. If prisoner was on his way home after first fight and was assaulted by deceased with a rock or other deadly weapon, and two wounds were inflicted on his head as described by witnesses; and if from the attack the prisoner was in great fear of his life or enormous bodily

harm, and on this account he killed deceased, it is excusable homicide and the jury should acquit. And if the jury find the facts as above (in last proposition) and that the prisoner from these circumstances had reasonable ground to believe and did believe he was in danger of great bodily harm or of death, and on this account killed deceased, he would be excusable and the jury should acquit.

Verdict of guilty of murder, judgment, appeal by prisoner.

*Attorney General* and *John Devereux*, for the State.

*Messrs. J. M. Gudger*, *M. Erwin* and *T. F. Davidson*, for prisoner.

ASHE, J. There were a good many exceptions taken in this case to the instructions given by His Honor to the jury, and one in regard to the drawing of the jury. The names of four jurors on the list were by mistake of the clerk omitted to be put in the box with the others, but upon discovery of the mistake they were put in and drawn. And ten jurors of the special *venire* when drawn were ordered to stand aside until the panel was exhausted, and then their names were called from the list in the order in which they had been drawn, and were disposed of by the state and prisoner, the prisoner accepting one of them. There was no exception taken at the time, but only after the verdict. The prisoner did not exhaust his challenges, and had the full benefit of his right of challenge to each of the jurors. He was in no way prejudiced by the irregularity, and even if he had been, his exception comes too late after verdict. "When any irregularity in forming a jury is silently acquiesced in at the time by the prisoner, and especially when he partially consents for the sake of a trial to such irregularities, he waives his right to except after conviction, and thereby take a double chance." *State* v. *Ward*, 2 Hawks, 443. See also

*State* v. *Boon*, 80 N. C., 4C1; *State* v. *White*, 68 N. C., 158; *State* v. *Davis*, 80 N. C., 412, and cases there cited.

During the argument of the case, there being some disagreement between the counsel as to what one Hicks, a witness for the state, had testified, he was recalled by His Honor and directed to state what he had testified on his first examination. The prisoner excepted to his being recalled. The court had the right to recall him. It was the most satisfactory mode of settling the disagreement, and could not have prejudiced the prisoner, especially as His Honor in his charge to the jury told them that his rehearsal of what Hicks stated was for the purpose of aiding them, but was not conclusive as to what he did say, and their own recollection should guide them.

His Honor in charging the jury, while referring to the wounds alleged to have been received by the prisoner, and proved by his father, sister and niece, told the jury that such evidence must be taken with some degree of allowance, and the jury should not give it the same weight as that of disinterested witnesses, but the rule which regards it with suspicion does not reject it or necessarily impeach it; and if from the testimony, or from it and the other facts and circumstances in the case, the jury believe that such near relations have sworn the truth, then they are entitled to as full credit as any other witnesses. There was no error in the instruction. In the case of *State* v. *Ellington*, 7 Ired., 61, where the mother and sister of prisoner had been examined for him, Chief Justice RUFFIN, in reviewing the instructions of the court below upon the character of their testimony, said : "Nor was there error in telling the jury that their relation to the prisoner affected their credit. * * * All writers upon evidence say, that though it does not make them incompetent, it goes to their credit; because we know that such relations create a strong bias, and that it is an infirmity of human nature sometimes, in instances of great

peril to one of the parties, to yield to the bias produced by the depth of sympathy and identity of interests between persons so closely connected. How far these witnesses adhered to their integrity or were drawn aside by the ties of nature between them and the prisoner, in other words, the degree of relation actually affected their veracity, was a question for the jury. It was proper to let them know that they might legally take the relation unto their consideration in estimating the credit to be given to their testimony, and there was nothing improper in stating also the reason, on which the rule of law rests." The judge below expounded the law on this point of evidence in explicit conformity to this opinion of the Chief Justice.

As to the other instructions:

There can be no objection to the first and fifth propositions. The law is correctly laid down in them.

The second, third and fourth, as abstract propositions may not be free from error, but when we consider them in their application to the evidence before the jury, we must hold they were not erroneous. The language of a judge in his charge to the jury is to be read with reference to the evidence and the points in dispute at the trial, and of course is to be construed in reference to the context. *State* v. *Tilly,* 3 Ired., 424.

The prisoner then asked for certain specific instructions which are numbered in the case as first, second, third, fourth and fifth.

The first in this series the judge declined to give, and the prisoner excepted. There was no error in the refusal, for he could not consistently with the law, as we conceive it to be, as applicable to the facts in the case, have given such instruction.

As to the second, third, fourth and fifth instructions, His Honor gave in each case instructions substantially as prayed for. He was not bound in his charge to use the very lan-

guage in which the prayer for instructions was couched. " A charge which substantially conforms to the instructions asked for by a party is sufficient. The judge need not adopt the words of such instruction." *State* v. *Scott*, 64 N. C., 586; *State* v. *Brantley*, 63 N. C., 518; *Burton* v. *March*, 6 Jones, 409.

Having disposed of the exceptions, we come now to the consideration of the question, " What is the grade of the prisoner's offence?"

No provocation whatever can render homicide justifiable or even excusable; the least it can amount to is manslaughter. If a man kill another suddenly, without any, or without a considerable provocation, the law implies malice and the homicide is murder. If the provocation be great, and such as must have greatly provoked him, the killing is manslaughter only. But in considering whether the killing amounts to manslaughter or murder, the instrument with which the homicide was committed must be taken into consideration; for if it were effected with a deadly weapon, the provocation must be great indeed to extenuate the offence to manslaughter. Archbold's Cr. Pl., 224 Here, the provocation was not very great. The rencounter, it must be noted, was brought on by the prisoner. He threatened in the beginning of the quarrel to whip the deceased if he did not pay him the paltry sum of five cents. The deceased was unarmed, told the prisoner that he was his friend and did not want a fuss, and asked those present not to let him jump on him ; but the prisoner seized hold on him, struck him, engaged with him on the ground in a " rough and tumble " fight, was pulled off the deceased, engaged with him again, and when separated the second time drew his pistol and threatened to take his life, the deceased all the while acting on the defensive, and then when he was held to keep him from shooting the deceased, as was his avowed intention, he told those holding him if they would let him go he would put up his pistol and do no more. He did put

his pistol in his pocket, and they let him loose. He was not then hurt; he did not complain of any hurt, only a few drops of blood were seen about his ear. He did not evince any very great excitement—certainly no frenzy—when he said let me go and I will put up my pistol. There was a great deal of deliberation in the remark, and when released he immediately followed the deceased, who had left the scene of the first conflict—no doubt to avoid the vengeance of the prisoner—came up with him on the road, and the next seen or heard of them was the sound of blows, and the deceased twice crying out, "Oh Lord, boys, hold him off me," and when the witnesses approached them the deceased was unresisting, and the prisoner, holding him by the left shoulder, was plunging his knife into his breast, inflicting on him several fatal wounds, one of which severed his jugular vein, and another penetrated to his heart, so deep and broad that the physician who examined them said he thrust his hand in and lifted up his heart. And then when the wounded man fled, suffused with his life blood fast ebbing, and fell down dead from exhaustion, the prisoner approached him, and looking on his bloody work, coolly said, " He is not hurt; he is only drunk.''

When there is such a determined purpose as manifested by the prisoner in this case, to force a fight on a peaceable and unoffending man, it is natural to look for some motive actuating his conduct. Before the first fight, while the prisoner was vaunting his determination to whip the deceased, unless he paid him that five cents " right there," the deceased reminded him that "some two months before, he (the prisoner) had been insulted at him." It must have occurred to the deceased that the prisoner's hostility on that occasion was prompted by that previous affront, or he would not just then have alluded to it. And so trivial was the pretext for assaulting the deceased, that it is most probable he

ascribed the prisoner's conduct to the real motive, that of avenging the supposed insult.

But conceding there was no express malice, how stands the case? The solicitor for the state admitted there was not cooling time between the first and second rencounters, but this court is not concluded by such admission. It matters not whether there was cooling time or not, if the prisoner acted coolly and vengefully or with a degree of violence out of all proportion to the provocation, his crime is that of murder. *State* v. *Chavis*, 80 N. C., 353; *State* v. *Curry*, 1. Jone, 280. Whatever provocation there was, it was brought on by the turbulent conduct of the prisoner himself. He was the aggressor, and from the beginning showed a disposition to take the life of the deceased, and in the last fatal conflict his conduct was marked by the utmost cruelty and brutality. The wounds he received, as testified to by his relations, were probably greatly exaggerated, for the witness Parrott, who went home with him after the homicide, testified that he saw some blood on his head, a little place of blood there, and the prisoner did not complain of being hurt. But admitting that the prisoner received the injuries described by his relations, in our opinion they did not amount to such provocation, under the circumstances of the case, as mitigated his crime to manslaughter.

" Where the deceased intended only a fight without weapons, and that was known to the prisoner, and the prisoner drew his knife without notice to the deceased, even if they actually engaged in the fight, the stabbing of the deceased by the prisoner would be murder." *State* v. *Scott*, 4 Ired., 409. And again, " where persons fight on fair terms, and after an interval, blows having been given, a party draws, in the heat of blood, a deadly instrument and inflicts a mortal injury, it is manslaughter only; but if a party enter a contest dangerously armed and fight under an unfair ad-

vantage, though mutual blows pass, it is not manslaughter but murder." *State* v. *Hildreth*, 9 Ired., 440.

Applying the principles enunciated in these and other cases we might cite, we are constrained to hold that the prisoner is guilty of murder. There is no error. Let this be certified to the superior court of Madison county, that the sentence of the law may be carried into execution.

PER CURIAM.                                   No error.