## STATE v. LILLISTON.

(Filed May 28, 1906).

*Homicide — Self-Defense —Recklessness — Instructions — New Trial for Newly Discovered Evidence.*

1. Where two men fight willingly with pistols in a crowded waiting room and a bystander was killed, both are guilty of murder, one as principal and the other as aiding and abetting.

2. Malice is implied when an act dangerous to others is done so recklessly or wantonly as to evince depravity of mind and disregard of human life, and, if the death of any person is caused by such an act, it is murder.

3. In an indictment for murder, the court did not err in refusing to charge that there was no evidence either of murder in the second degree or manslaughter, where the evidence is conflicting as to whether the deceased was killed by the prisoner or by another.

4. An excerpt from a charge to the jury is to be construed with the context and in connection with the whole charge.

5. In an indictment for murder, where the prisoner contended that he was suddenly assaulted, the court did not err in charging that in such cases the right of self-defense exists if there is apparent danger from waiting for the assistance of the law and there is no other probable means of escape.

6. A motion for new trial for newly discovered evidence, will not be granted, even in a civil case, where the evidence is merely cumulative or where it was withheld by the party moving.

7. Motions for new trials for newly discovered evidence cannot be entertained in this court in criminal cases.

CONNOR and WALKER, JJ., dissenting.

INDICTMENT for murder against Robert H. Lilliston, heard by *Judge George W. Ward* and a jury, at the January Term, 1906, of the Superior Court of WAKE. From a verdict of murder in the second degree and judgment thereon, the prisoner appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*Argo & Shaffer* and *J. N. Holding* for the defendant.

CLARK, C. J.    It was in evidence that the prisoner Lilliston and one Clark were two "fakirs" who had been attending the Raleigh Fair, and on Thursday and Friday nights, they with others were at a house of ill-fame, engaged in gambling and drinking, and that a difficulty sprung up there on Friday night between these men over charges of cheating. On Saturday, 21 October, they went to the railroad station in Raleigh to take the train to leave the city, and there in the crowded reception room they engaged in shooting at each other—the next room, separated only by a glass partition, being occupied by ladies and children. It is admitted by the prisoner that Clark fired two shots and then ran out of the east door and that Lilliston fired five shots. And these two men, who showed this contemptuous defiance of law and of the lives of so many peaceable people who were entitled to the protection of the law in their lives and persons, escaped unharmed, while one bystander was killed, another seriously wounded, and others narrowly escaped. If they fought willingly in such a place, the reckless disregard of

law.amounts to malice, and if any bystander was killed both were guilty of murder—one as principal and the other as aiding and abetting. The homicide occurred in a crowded waiting room. The doctrine is well settled that "malice is implied when an act dangerous to others is done so recklessly or wantonly as to evince depravity of mind and disregard of human life, and if the death of any person is caused by such an act, it is murder. The most frequent instance of this species of murder is where death is caused by the reckless discharge of firearms under such circumstances that some one would probably be injured, and even where the discharge was accidental, resulting from handling the weapon in a threatening manner it was held murder." 21 Am. & Eng. Enc. (2 Ed.), 153, and cases cited in the notes.

The jury have acquitted Clark; and Lilliston, convicted of murder in the second degree, presents in substance three grounds of alleged error in the conduct of the trial by the learned and impartial judge. He contends that the judge should have told the jury that there was no evidence against him either of murder in the second degree or manslaughter. It is admitted that Clark stood towards the southeast and fired northwestwardly two shots, one of which struck above the ticket office. Mr. Horton testified that he dropped behind the radiator and was struck on the buttock (which was exposed) by Clark's second bullet, which entered, he says, from the side Clark was on, and which could not have come from the direction where Lilliston was at that time. Of the five shots fired by Lilliston, the location of four found embedded in the building are admitted. The State contends that Lilliston's other ball was the one found in the body of Smith, the deceased. There was evidence, if the jury believed it, that Lilliston dodged behind Smith, and that in the excitement, Lilliston, the lodgment of whose other balls showed that he was firing wildly, shot Smith. The prisoner contended that this was not true, also that it was Lilliston's

ball that struck Horton, and further that a man named Arnold shot Smith. Only seven balls were traced, including those lodged in the bodies of Smith and Horton. All these matters were purely issues of fact for the jury and not for the court. The court, in the words of the prisoner's prayer, charged the jury that "the defendant Lilliston contends that there is evidence before the jury that Arnold, one of the State's witnesses, shot and killed Smith in the north aisle of the waiting room near the ticket office. The court charges the jury that if you have a reasonable doubt as to whether Arnold killed Smith or as to whether Lilliston killed Smith, it will be your duty to acquit Lilliston." The prisoner admitted that Smith was not killed by Clark. The bullet did not come from that side. He offered evidence tending to show that he fired in self-defense only, and there was evidence to the contrary, both that he began the difficulty, that he engaged in it willingly and continued firing while the other man was running.

These questions of fact were ably presented to the jury by counsel of great skill and long experience. There was evidence, as the judge properly held, to submit the case to the jury, and their finding is not reviewable by us. Had the judge who tried this cause and heard the witnesses and could judge from their bearing as to the weight to be given their evidence, felt any doubt of the correctness of the verdict, it was in his power and it would have been his pleasure to set it aside. He refused to do so.

The prisoner also excepts to the following excerpt from His Honor's charge: "Another principle of law is where in an indictment for murder the State has satisfied the jury beyond a reasonable doubt that the prisoner slew the deceased intentionally with a deadly weapon, nothing else appearing, the law presumes that the defendant is guilty of murder in the second degree, and the burden of proof shifts to the defendant to satisfy the jury, not beyond a reasonable doubt, but to sim-

ply satisfy them, that he was excusable or that the crime is for a lesser offense, to-wit, manslaughter, which is, as I told you, the unlawful and felonious killing of a human being with malice aforethought, that is to say, that the defendant is called on to satisfy the jury of the existence of such facts and circumstances as will rebut the presumption of malice raised by the use of a deadly weapon, and reduce the grade of the offense from murder in the second degree to manslaughter, or to go further and satisfy the jury of the existence of such facts and circumstances as will justify the killing on the plea of self-defense, that is, that the prisoner had reasonable apprehension and did apprehend that it was necessary for him to shoot in order to protect his own life or save himself from great bodily harm." This charge is to be construed with the context, and reading it in connection with the whole charge we do not find any reversible error. *State v. Tilley* 25 N. C., 424; *State v. Boon,* 82 N. C., 649; *State v. Holman,* 104 N. C., 867; *State v. Gentry,* 125 N. C., 735.

The prisoner further excepts to the following paragraph of the charge: "Self-defense exists where one is suddenly assaulted and in the defense of his person where an immediate and great bodily harm would be the apparent consequence of waiting for the assistance of the law, and there is no other probable means of escape, he kills the assailant." This paragraph is quoted from 1 Wharton Crim. Law (9 Ed.), section 306. We see no ground for criticism of the word "apparent." It is favorable to the defendant. Had it been omitted and the word "actual" had been used, the prisoner would have excepted. Nor do the words "and there is no other probable means of escape" improperly restrict the right of self-defense upon the circumstances of this case. The judge did not restrict self-defense to cases of sudden assault, but the prisoner contended that this was a sudden assault, and the judge charged that in such cases the right of self-defense exists if there is apparent danger from "wait-

ing for the assistance of the law and there is no other probable means of escape." In *State v. Kennedy,* 91 N. C., 578, it is said: "There may be cases, though they are rare and of dangerous application, where a man in personal conflict may kill his assailant without retreating to the wall." This is cited and approved in *State v. Gentry,* 125 N. C., 733. The doctrine of *State v. Blevins,* 138 N. C., 668, and *State v. Hough, ibid.,* 663, is not in point here. Those cases hold that where a man is murderously assaulted, without fault on his part, he is not required to retreat to the wall, but may stand his ground and kill to save his own life; but to confer such right it must appear that the assault upon him was sudden, fierce and *continuous.* But, here, this was not true, for Clark fired only twice and then ran, and the prisoner testified that he fired himself five times, commencing when Clark was near the radiator in the center of the large room, and that he fired the last as Clark went out the east door. This evidence of Lilliston tends to show that Clark was not firing, but running, trying to escape. There was much other evidence to the same purport. In such state of facts the law is thus laid down in *State v. Hill,* 20 N. C., 629: "Even if the prisoner had not begun the affray, but had been assaulted in the first instance, and then a combat had ensued, he could not excuse himself as for a killing in self-defense, unless he quitted the combat before a mortal blow was given, if the fierceness of his adversary permitted, and retreated as far as he might with safety, and had then killed his adversary of necessity to save his own life."

Here, though, "the fierceness of the adversary" abated immediately after the second shot (when he fled); the prisoner testified that he shot five times, some, if not all, of which shots were fired while Clark was getting from the radiator to the door, and as he went out of the door. It is worse than if he had killed the fleeing man, for he not only shot unnecessarily, not for his own protection, but in a crowded

waiting room where his balls were much more liable to hit than if he had only one man before him. His Honor told the jury that "where two people are engaged in an unlawful act, such as an affray in a public place, shooting at each other willingly, that is fighting willingly, and not forced to fight in self-defense, and one kills a bystander, it is murder in the second degree or manslaughter, according as it is accomplished with or without malice." If Lilliston had killed Clark, the jury would have been justified, upon Lilliston's own evidence taken alone, in finding him guilty in that there was no necessity to do so to protect himself. He fired wildly, as he testifies himself, and the brief of his counsel says: "The evidence shows that four of the five balls Lilliston fired are located in the walls and seats of the waiting room." Lilliston's fifth and last ball, his counsel contends, was the one that struck Horton. Horton says that it was the second ball that was fired and that it struck him coming from Clark's direction. This disputed question was left to the jury, as was also the prayer as to Smith having been shot by Arnold, and the jury said that beyond all reasonable doubt in the minds of the twelve, Lilliston's ball was the one that killed Smith. It is useless to recapitulate the voluminous and somewhat conflicting evidence. The case was fairly and impartially tried and we find no reversible error.

The prisoner filed a motion in this court for a new trial for newly discovered evidence which he avers would prove that Arnold fired the fatal shot. This motion has never been allowed in this court in a criminal case. But had it been made in a civil action, in which it is sometimes though rarely allowed, this motion would be disallowed, both because it would be merely cumulative of the evidence which was offered and which was submitted to the jury with a prayer thereon as requested by the prisoner, and, for the stronger reason, that the State filed, before the argument here, the affidavit of O. L. Parham, jailer of Wake County,

that Lilliston "was in possession of the evidence of Mrs.
Willie Richardson before his trial, because he (Parham)
had heard him (Lilliston) talking about it with others in
jail." He did not offer that evidence at the trial. The court,
even in a civil case, would not seriously consider a motion
for a new trial upon evidence which was withheld from the
jury by the party moving.

It has uniformly been held that motions "for new trial
for newly discovered evidence" and "rehearings" cannot be
entertained in this court in criminal actions.

In *State v. Jones,* 69 N. C., 16, *Reade, J.,* held that this
court had no power to rehear in a criminal action, saying:
"In equity cases and in civil actions, the practice has been
common, but, in criminal cases, never to our knowledge."

In *State v. Starnes,* 94 N. C., 982, where a motion for a
new trial for newly discovered evidence was made in a crim-
inal action, it was denied, *Smith, C. J.,* saying: "No such
proposition in reference to criminal prosecutions has ever
been made or entertained, so far as our investigations have
gone, in this court. The absence of a precedent (for we can-
not but suppose such applications would have been made on
behalf of convicted offenders if it had been supposed that a
power to grant them resided in this appellate court) is
strong confirmatory evidence of what the law was under-
stood to be by the profession. We are clearly of the opinion
that no such discretionary power, as that invoked, is con-
ferred upon this court. In appeals from judgments rendered
in indictments, our jurisdiction is exercised in reviewing
and correcting errors in law committed in the trial of the
cause, and to this alone. *State v. Jones,* 69 N. C., 16."

In *State v. Starnes,* 97 N. C., 424, *Smith, C. J.,* again
says: "The motion, as far as our own and the researches of
counsel disclose, is without precedent in the administration
of the criminal law on appeals to this court, and is so funda-
mentally repugnant to the functions of a reviewing court,

whose office is to examine and determine assigned errors appearing in the record, that we did not look into the affidavits offered in support of the motion, nor hesitate in denying it."

In *State v. Rowe,* 98 N. C., 630, *Davis, J.,* says: "Upon careful consideration, we must adhere to the principle that in criminal actions the appellate jurisdiction of this court is limited to a review and correction of errors of law committed in the trial below. *State v. Jones,* 69 N. C., 16; *State v. Starnes,* 94 N. C., 973." The cases cited show that the court adhered to its previous rulings on grounds broad enough to apply both to motions for "new trials for newly discovered evidence" and for "rehearings." The court then proceeded to point out that there was no ground for the innovation which was sought, since the governor could look into the entire merits of the case and render any relief justice should demand.

In *State v. Edwards,* 126 N. C., 1055, the court dismissed the motion as a well settled matter, merely saying that "such motions are not entertained in criminal cases, as has been *often* held." In *State v. Councill,* 129 N. C., 511, the matter was fully considered and the court held that this court could not grant either rehearings or new trials for newly discovered evidence in criminal actions. In *State v. Register,* 133 N. C., 746, it is again said that "the prisoner also moved this court for a new trial for newly discovered testimony, but such motions can only be made in civil actions. Our precedents are uniform that this court has no jurisdiction to entertain such motion in criminal actions."

So the point is settled if the uniform practice of this court and its repeated and uniform decisions to the same effect can settle anything. But it is contended that all these decisions and the uniform practice are erroneous and should now be reversed. Counsel cite the statutes. In Laws 1815, chapter 895, the power was first conferred to grant new trials in criminal cases (and the prisoner's brief admits

141——56

that it was then restricted to the Superior Court judges) as follows: "The judges of the Superior Courts of law are hereby empowered and authorized, upon application of the defendant, to grant new trials in criminal cases when the defendant or defendants are found guilty, in the same manner and under the same rules, regulations and restrictions as in civil cases, any law, usage or custom to the contrary notwithstanding."

In 1805 the title of the Court of Conference had been changed to "Supreme Court" and in 1810 the Supreme Court had been authorized to elect a chief justice, though it was not constituted as at present till the Act of 1818, which went into effect 1 January, 1819. In 1854 chapter 35, section 35, of the Revised Code, the words "Courts of Law were substituted for "Superior Court Judges," the object being as stated in prisoner's brief, to limit the authority to the judge when sitting in a court of law instead of a court of equity.

The prisoner rests his argument to overrule the uniform decisions and settled practice of this court upon the following section 3272 of the Revisal, which reads, "The courts may grant new trials in criminal cases when the defendant is found guilty under the same rules and regulations as in civil cases." This clearly refers to the time *"when* he is found guilty," and when that section is turned to, it will be found further that it is under sub-head *"Trials, Superior Court,"* under which are grouped all the provisions peculiar to trials in that court, to-wit, sections 3262 to 3273, inclusive, and the note of the commissioners to said section 3272 shows that it was chapter 895, Laws 1815, and Revised Code, chapter 35, section 35, above quoted, which the prisoner's brief admitted applied only to the Superior Court, and was brought forward as Code (1883), section 1202, which was in force when the above decisions were made, and is now again brought forward in the Revisal, section 3272.

The Constitution, Article IV, section 8, is conclusive:

"The Supreme Court shall have jurisdiction to review, upon appeal, any decision of the courts below, upon any matter of *law or legal inference,* and the jurisdiction of said court over 'issues of fact' or 'questions of fact' shall be the same as exercised by it before the adoption of the Constitution of 1868." The power the court is now asked to exercise is not a matter of law or legal inference and even if it could be deemed "issues of fact" or "questions of fact," such power was not exercised prior to the adoption of the Constitution of 1868, as we have seen. Indeed, even when the court below granted or refused a new trial for other cause than error of law, as for newly discovered evidence, this court had no jurisdiction to consider it. *Holmes v. Godwin,* 69 N. C., 471. Motions for new trials for newly discovered evidence were equitable in their nature and did not extend to criminal actions until the aforesaid Act of 1815, chapter 895, now Revisal, 3272, which extended the power only to the Superior Court.

But even if the Constitution and the precedents did not forbid it and it were an open question, this court ought not to grant new trials for newly discovered evidence in criminal actions for several reasons: First, There is no *necessity* for it (the sole ground on which they are allowed in civil actions), for the Governor is vested with power to investigate the facts more fully than we could, and to do what justice shall require. There is no complaint that the executive has not been sufficiently liberal in its exercise. Again, it is the well known complaint of our governors that, in matters of this kind, insistence and pressure have been often too great. This court has no time for such applications and no disposition to seek or invite them. The Constitution has wisely restricted our power in criminal cases, to reviewing on appeal "decisions of the courts below in matters of law or legal inference."

And lastly, the odds against the State in a trial for a capi-

tal offense are already sufficiently great. The prisoner has 23 peremptory challenges against four for the State; the prisoner can be found guilty only by a unanimous verdict, beyond the reasonable doubt, of twelve men; but if one juror entertains such a doubt, there can be no conviction. In England to this day, the defendant cannot appeal in a criminal case, but, here, though the defendant can appeal, the State cannot, however erroneous the rulings of the judge (though formerly the State could appeal here from a verdict of not guilty and still can do so in Connecticut and some other States). There are, too, many fine distinctions and technicalities which are urged on an appeal, and still other advantages in favor of one charged by a grand jury with killing his fellow man and disadvantages to the State, besides the unlimited right of appeal to the Governor and the absence of any restriction upon his power of commutation, reprieve or pardon. Even if the court possessed the power, it should not add another serious disadvantage to those under which the State is already placed, when endeavoring to enforce the guaranty of safety of life and limb to its citizens, by seeking the conviction of those who have done murder. These disadvantages are far greater now than is necessary to make sure the acquittal of the innocent. The "bloodiest" possible administration of the law is that which permits murder, by making conviction of the guilty more difficult.

"Mercy murders, pardoning those who kill."

In refusing to entertain such motions in criminal cases, we are adhering to the uniform practice and rulings of the court from the first day of its existence down to the present. We are refusing to make an innovation. The object of punishment for murder is not to reform the offender, but by the certainty of infliction and its unpleasant nature, to deter others from the like offenses. The number of homicides in North Carolina, as recorded in the United States census and the annual reports of the Attorney-General of this State, is

much larger annually, in proportion to population, than in most of the other States. The object to be sought in the administration of the law is to diminish the number. This cannot be done by adding to the disadvantages now imposed upon the State, in such trials beyond what has been done in the past. If punishment deters from crime (which is its object), then that homicides are more frequent here than in most States, shows a lack of efficient enforcement of the law in such cases. It is not for the courts to add additional difficulties to its enforcement.

No Error.

CONNOR, J., dissenting: This case has given me much anxious concern. Certainly there is nothing in the record calculated to arouse any sympathy with the prisoner or his conduct. This fact imposes upon the judge the duty of especially guarding himself against relaxing rules of the law and permitting wrong and injustice to be done him. It behooves the State through its courts to protect the lives of its citizens. One of the means by which this is sought to be done is the detection and upon conviction, the punishment of those who commit a criminal homicide. It clearly, if not primarily, affects the honor of the State that she permit none to be punished who are innocent or convicted otherwise than by the law of the land. I trust that if I appear to be jealous of the honor of the State in that respect, I may not for that reason be charged with a want of as much concern for the due execution of the law as my brethren. To my mind no greater wrong can be done the State and every citizen thereof than the punishment of an innocent man. It seems from the evidence that the prisoner belongs to a class of persons who purchase "concessions" at State fairs to conduct the business of "fakirs." This fact does not in my judgment throw any light upon the legal aspects of his conduct at the time of the homicide as presented upon this record. In this

connection my mind reverts to the lofty sentiment and noble words of a learned, wise and good judge, when it was being urged against a prisoner that he was a slave. They are worthy to be perpetuated and held in everlasting remembrance. *Gaston, J.,* approved by *Ruffin, C. J.,* and *Daniel, J.,* in *State v. Will,* 18 N. C., 121 (172). I cannot concur in the conclusion that His Honor correctly defined to the jury the right of self-defense. I must confess, with all possible deference to the learned judge who tried the cause and my brethren, that I do not clearly comprehend the meaning of the language, and while not necessarily so, it is not entirely unreasonable to assume, that the jury may not have fully understood the extent of this right and its legal limitations. His Honor said to the jury: "Self-defense exists where one is suddenly assaulted and in the defense of his person, where immediate and great bodily harm would be the apparent consequences of waiting for the assistance of the law and there is no other probable means to escape, he kills the assailant." Without undertaking to discuss the question at length, I find the law as approved by this court laid down by *Mr. Justice Bynum,* in *State v. Dixon,* 75 N. C., 275 (279):

"The general rule is, 'that one may oppose another attempting the perpetration of a felony, if need be, to the taking of a felon's life;' as in the case of a person attacked by another, intending to murder him, who thereupon kills his assailant. He is justified. 2 Bish. Cr. Law, section 632. A distinction which seems reasonable and is supported by authority, is taken between assaults with felonious intent and assaults without felonious intent. In the latter the person assaulted may not stand his ground and kill his adversary, if there is any way of escape open to him, though he is allowed to repel force by force, and give blow for blow. In this class of cases, where there is no deadly purpose, the doctrine of the books applies, that one cannot justify the killing of the other, though apparently in self-defense, unless he

first 'retreat to the wall.' In the former class, where the attack is made with murderous intent, the person attacked is under no obligation to flee; he may stand his ground and kill his adversary if need be. 2 Bish. Cr. Law, section 6333, and cases there cited. And so Mr. East states the law to be. 'A man may repel force by force, in defense of his person, habitation or property, against one who manifestly intends or endeavors by violence or surprise to commit a known felony, such as murder, rape, burglary, robbery and the like upon either.' In these cases he is not obliged to retreat, but may pursue his adversary until he has secured himself from all danger; and if he kill him in so doing, it is called justifiable self-defense."

This I consider to be the correct statement of the law as frequently approved in this court. *State v. Matthews,* 78 N. C., 523; *State v. Castle,* 133 N. C., 779; *State v. Clark,* 134 N. C., 698; *State v. Hough,* 138 N. C., 663; Wharton's Crim. Law (9 Ed.), sections 306, 487. I cannot think that the "sacredness of human life" is promoted by weakening or unnecessarily limiting the right of self-defense. The latter hath in all ages been held to be a protection to human life and the preservation of it in its integrity is, to my mind, a safeguard to the life of the citizen. I cannot but deplore any tendency to place unnecessary restrictions upon it. Its landmarks have been fixed by the sages of the law and should not be departed from. In regard to the motion for a new trial for newly discovered evidence, I can only say that upon the uncontradicted affidavit of the jailer, it appears that the prisoner knew of the testimony of which he now seeks to avail himself. As, however, the question is discussed at length in the opinion I deem it proper to say that while I recognize the force of the precedent made in this court, I have never been able to understand why if this court has the power to grant a new trial for newly discovered evidence in a case involving property of ever so small a value, it has not like

power where the liberty and life of the citizen is involved. I have read with care all that has been said upon this subject. The force of the argument which deprives us of the power to grant this relief, to my mind applies with equal force against our power to grant it in a civil case. It is one of those questions which, to my mind, will only be settled when reasons more cogent than any yet advanced are found to. sustain the conclusion of the court. The argument *ab inconvenienti* does not impress me. When human life and liberty are at stake I cannot concede the force of this argument. I am much impressed with the learned brief containing a history of our statute upon this subject, filed by the counsel for the prisoner. If the facts set forth in these affidavits are true, coupled with the doubtful character of the testimony, I am impressed with the deep conviction that a grave and fatal mistake has been made in fixing the guilt upon the prisoner. The testimony, to my mind, strongly tends to show that another and a swift witness in this cause took the life of the deceased, who was a friend and partner of the prisoner. Upon his own evidence the prisoner is guilty of a grave and highly criminal violation of the laws of the State. For the reasons given I am constrained to dissent from the conclusion reached by a majority of the court.

WALKER, J., concurs in the dissenting opinion.