STATE v. FRED JONES.

(Filed 19 May, 1926.)

**1. Homicide—Murder—Insanity—Burden of Proof—Preponderance of Evidence.**

The presumption of the continuance of previous insanity relied upon by the prisoner as a defense on his trial for murder, does not relieve him of the burden of proving that he was insane when the homicide was committed, by the preponderance of the evidence.

**2. Homicide—Murder—Insanity—Presumptions—Adjudication of Lunacy.**

Where the prisoner pleads insanity as a defense for murder, and relies upon the presumption that when previously shown to exist it continues to the time of the homicide, the fact that on a former occasion when imprisoned for a felony in another state, the prison physician confined him with the criminal insane, does not meet our requirements as to an adjudication of lunacy, and is insufficient alone to raise the presumption.

48—191

APPEAL by defendant from *Stack, J.,* at October Term, 1925, of FORSYTH. No error.

Indictment for murder. Verdict: guilty of murder in the first degree. From judgment upon the verdict, that defendant be punished with death, by means of electrocution, as provided by statute, defendant appealed to the Supreme Court.

*Attorney-General Brummitt and Assistant Attorney-General Nash for the State.*

*Hastings & Booe, H. M. DuBose, Jr., and J. S. Fitts for defendant.*

CONNOR, J. The evidence offered at the trial below, by the State, and submitted to the jury by the court, without objection from defendant, was sufficient to support the State's contention that defendant killed deceased, with a deadly weapon, and that such killing was deliberate and premeditated, done in the perpetration of a felony, unless defendant was insane at the time of the killing. No exceptions appear in the record to the instructions of the court, given in the charge to the jury, relative to the contentions of the State that defendant killed deceased, by shooting him with a pistol, and that the homicide was committed, after deliberation and premeditation, in the perpetration of a felony. All the exceptions are to the admission or exclusion of evidence, relied upon by defendant to sustain his defense, based upon his contention that he was insane at the time of the killing, or to instructions given, or refused relative to this defense.

The evidence tends to show that on Saturday night, 13 June, 1925, at about 9 o'clock, deceased, J. M. King, G. C. Messick, P. C. Johnson and J. L. Lawrence were at work, as employees, in the Winston-Salem Laundry, in the city of Winston-Salem. They were settling the cash register and preparing to close up after the day's work. Suddenly a man appeared in the room where they were at work, with a pistol in his hand. He called out, "Up with your God damned hands, every one of you, or I will kill every one of you." He shot the deceased, J. M. King, before any one in the room realized his purpose. King fell, mortally wounded, and the man stepped over his body and went at once to the cash register. He took the currency from the cash register, leaving the silver money. Then with the pistol in his hand, he turned to each of the other three employees and compelled each to give him the money which he had on his person. When the man entered the room, he had a blue handkerchief over his face; his cap was pulled down on the left side of his head. While in the room the handkerchief fell off his face; he picked it up from the floor, and with his arm over his face, and the pistol still in his hand, backed out of the door, commanding the men in the room to

keep their hands up, saying that if they did not, he would kill them. J. M. King had two wounds on the left side of his face, resulting from the pistol shots. He was taken to a hospital, where he died the next morning. The wounds resulting from the pistol shots were the cause of his death.

Defendant, Fred Jones, according to the evidence, was first seen in Winston-Salem on Tuesday before the Saturday night on which deceased was killed. He is a negro, and with a companion, went to a club room maintained in the city for negroes. Although a stranger to its members, he was admitted to membership in the club. He rented a room from the manager of the club, paying a part of the rent in cash, and saying that he would pay the balance on Saturday night. On Saturday morning he went from his room to the club; later in the day he went out into the city, and remained away until about 4 p.m. He then returned to the club and remained there until night. He returned about 8 p.m. and asked the manager to serve him a lunch, saying that he had no money with which to pay for it. After eating, he again left the club, having put on his overalls, and saying that he was going to leave that night for New York; that he would have to beg his way. He put a blue handkerchief in his pocket and left the club at ten or fifteen minutes to nine.

The manager of the club, upon his return home, found Fred Jones in the room which he had rented to him. There was a woman in the room with him. When told that "everybody down town says you killed that man," Fred Jones replied, "They can't prove it." He was told that people were saying that they saw him going into and coming out of the building in which the man was killed. He then said, "What must I do? I am going to the woods." He was taken by the witness to a room in another part of the city, in order that he might avoid arrest. He was later arrested in this room. He offered the witness who took him to the other room ten dollars.

The day after he was arrested, Fred Jones made a statement. He said that he had talked to the manager of the club on Thursday and Friday about the laundry and discussed with him whether or not there was a watchman there, and whether or not they had money in the laundry. He said that he went to the laundry and there shot Mr. King because he thought Mr. King was going to strike him; that he searched all the men there except Mr. King and got forty dollars in all. He declined to tell the name of the woman found in the room with him after he left the laundry, saying that she was not implicated. He related his past life to the witness, saying that he had been in a penitentiary upon a conviction for manslaughter.

STATE *v.* JONES.

Dr. Albert Anderson, superintendent of the State Hospital for the Insane at Raleigh, testified that he first saw defendant, Fred Jones, some time in June, 1925, after the homicide. Dr. Anderson examined defendant, at the request of his counsel, first in the jail at Winston-Salem, and later in the State's prison at Raleigh. He saw him at different times, over five or six weeks. He said, "My opinion is that defendant is suffering from a mental disease, known as dementia præcox, of the paranoid type. This disease manifests itself in early childhood by peculiarities which differentiate the patient from normal children. It develops through childhood, and manifests itself by definite symptons in early manhood. The patient is irregular in his habits, and when the disease is of the paranoid type, it frequently manifests itself in criminal tendencies. Persons suffering with the disease have outbursts of passion; they manifest hate and desire to accomplish immoral and illegal things of great variety. It is a chronic and progressive disease, and is frequently accompanied by a tendency to commit murder. In my opinion, this defendant is insane. The type of the disease with which this defendant is suffering is incurable. In my opinion, based upon my examination of defendant, in jail at Winston-Salem, and in the State's prison at Raleigh, defendant was insane on the night of 13 June, 1925, the time of the homicide. At intervals the paranoid type of dementia præcox know the difference between right and wrong in a simple way, but I do not think they fully appreciate the nature and consequences of their acts. I do not say that defendant did not have sufficient mental capacity on the night of 13 June, 1925, to know right from wrong. He may have known right from wrong, but I do not think he knew the full significance or nature of his act. I think he knew when he presented the pistol at the man, and pulled the trigger, that the natural consequence of the act would be to kill the man. I do not think he appreciated the nature and consequences of his act in shooting the deceased, as a normal man would."

Rev. George W. Lee, pastor of the North Winston Presbyterian Church, testified that he saw defendant on Sunday afternoon, after the homicide; that he talked with him then and subsequently saw and talked with him when he went to the jail, on Wednesday and Sunday afternoon to visit the prisoners confined there. Defendant wrote him a letter, after he was taken to the State's prison, in regard to his spiritual condition, expressing his joy in the assurance of God's help in his trouble, and in the hope of the salvation of his soul. This witness was of the opinion that defendant is insane. He talked to him, more or less.

Defendant offered evidence tending to show that on 4 March, 1921, he was committed to the Connecticut State prison, from Hartford County, Connecticut, upon a sentence of not less than three, nor more

STATE *v.* JONES.

than five years for the crime of assault with intent to murder. On 6 July, 1922, upon an examination by the prison physician, defendant was declared insane, and on the next day thereafter he was removed to the insane ward of the State prison. He remained continuously in the insane ward until his discharge, upon the expiration of the maximum term of his sentence, on 7 May, 1925. He was delivered into the custody of the Connecticut Prison Association, as provided by the statute of that state.

Between the date of his discharge from the insane ward of the Connecticut State prison, and the date of the homicide, defendant served a short term on the roads of Rowan County, this State, upon conviction of a misdemeanor; after the completion of said term, he was employed in work at a quarry by the Hardaway Construction Company, at Woodleaf. He left the quarry on Tuesday, the same day that he was first seen in Winston-Salem, preceding the Saturday on which the homicide was committed.

The testimony of many witnesses, who testified that they saw and talked with defendant, while he was at work on the roads in Rowan County, and while he was at work at the quarry, was offered by the State. They expressed the opinion that defendant was sane. There were also witnesses who testified that they saw and talked with defendant, while he was confined, first in the jail, and then in the State's prison, and that in their opinion he was sane.

We have given careful consideration to defendant's exceptions to the admission and exclusion of evidence. Assignments of error based upon these exceptions cannot be sustained. We do not deem it necessary to discuss these assignments of error. It is manifest that defendant has not been prejudiced in the trial by the admission or exclusion of evidence. Much of the evidence excluded was merely cumulative and that admitted over defendant's objection could not have affected the result of the trial. However this be, his Honor's rulings upon these matters are well supported on principle and by the authorities. We find no error in these rulings.

Defendant assigns as error the refusal of the court to instruct the jury, as requested by him, in writing, "that if the defendant, Fred Jones, was insane at the time he was confined in the insane department of the State prison of Connecticut, the presumption is, not as it is in the ordinary case, that is that the defendant is sane until he proves his insanity, but the presumption is that he is still insane, and the burden of proving his sanity is upon the State, and the State must satisfy you by a preponderance of the evidence that he is sane."

The court instructed the jury as follows: "The insanity which would be available to the defendant must be a mental disease such as renders

the defendant incapable of knowing the nature and quality of the act he was committing. The law does not recognize as a defense emotional insanity, brainstorm, temporary or transitory insanity, but it must be some kind of a disease of the mind, such a defendant claims his mind was diseased with. The test is, gentlemen of the jury, as to whether or not he was responsible, is a knowledge between right and wrong. If he knew the act he was engaged in was wrong, and that it was unlawful, then in the eye of the law he would be sane and his plea would not avail him, but if at the time of the act he did not know that his act was wrong, and did not know the difference between right and wrong, then in law he would be insane, and he would not be responsible for his act, but if he did know so at the time of the act, then his plea of insanity cannot avail him, and as stated before, the burden of proof is on the defendant on that issue." Defendant excepted to this instruction and assigns same as error.

By these assignments of error, defendant presents his contention that having shown that he was insane prior to the killing of deceased by him, there is a presumption that such insanity continued up to and included the moment he killed deceased; that by reason of his previous insanity and of the presumption of its continuance, the burden of proving that he was sane and therefore responsible, in law, for his act, when he killed deceased, was on the State; that the general rule established as law in this jurisdiction that insanity, being a matter of defense, must be proved by the defendant, who relies upon insanity as his defense in a criminal action, is not applicable to the facts in this case.

This contention cannot be sustained. *S. v. Vann,* 82 N. C., 631, is an authority to the contrary. It was there held by this Court that matters of extenuation and excuse, or of discharge by reason of insanity, must be shown by those who set them up; that the prior insanity of the defendant in that case having been admitted by the State, upon his trial for murder, it was incumbent on defendant to prove an habitual or permanent insanity before the homicide. "If the fact of its existence, originally, or its presumed continuance at the time of the killing was controverted by the evidence of the State, defendant would have to show and that by evidence satisfactory to the jury, at least the fact of a continuance of insanity at the time he slew the deceased; or failing so to do, the legal conclusion, from malice implied, would have still remained, and his offense would have still been murder." In *S. v. Terry,* 173 N. C., 761, *Justice Brown* says: "We understand it to be well-settled in this and other states that in a criminal prosecution, where the defense is insanity, the burden of proof is always on the defendant to prove such insanity, not beyond a reasonable doubt, but to the satisfaction of the jury." *S. v. Campbell,* 184 N. C., 765. In *S. v. Hancock,* 151 N. C.,

699, *Clark, C. J.,* says: "By the uniform rulings in this State, the burden of proving insanity in a criminal case is on the defendant who sets it up. *S. v. Norwood,* 115 N. C., 793; *S. v. Potts,* 100 N. C., 457; *S. v. Payne,* 86 N. C., 610; *S. v. Vann,* 82 N. C., 637; *S. v. Starling,* 51 N. C., 366, and there are many others in our Reports. This is sustained by the great weight of authority elsewhere, though there are some states which hold a different doctrine."

Evidence of previous insanity, admittedly competent upon the question of defendant's sanity at the moment of the killing of deceased by him, may well have determined the burden, so-called, of proceeding with the evidence, but it cannot be held that such evidence, although accompanied by the presumption of the continuance of the insanity, affected the rule as to the burden of proof upon the question involved in the issue. *Hunt v. Eure,* 189 N. C., 382; *Speas v. Bank,* 188 N. C., 524. Where a totally independent defense in a criminal action is set up, as insanity, the burden is upon the defendant upon the question involved in the issue, as in this case, of the sanity of defendant at the time he shot and killed deceased. The fact of previous insanity, if admitted or proved, accompanied by the presumption of its continuance, may be relied upon by defendant to sustain prima facie the burden which he assumes by his plea of insanity, as a defense, but it cannot be held that the mere fact of insanity, prior to the commission of the act, alleged to be a crime, although such condition is presumed to continue, relieves the defendant of the burden, imposed upon him by the law of this State, to offer evidence sufficient at least to satisfy the jury that he was insane at the time of the commission of the act, and therefore not responsible for his act as a crime. The presumption is merely evidentiary, and is not conclusive.

There is no evidence on this record that defendant had been adjudged insane by a court which recognizes the same standard of sanity as that recognized and enforced in this State; there is evidence that he had been declared insane by the prison physician of the State prison of Connecticut, and in consequence of such declaration had been confined in the insane ward of the State prison. It cannot be held that the declaration of the prison physician, although made in the performance of his official duty, that defendant was then insane, has the force and effect of an adjudication by a court of competent jurisdiction that he was insane and therefore not responsible, under the law of this State, for his acts subsequently committed herein. It is manifest from this record that the standards and tests of sanity adopted and acted upon by members of the medical profession who are admitted experts on the subject of mental diseases, differ so radically from those recognized and enforced by the courts of this State, that it cannot be held as a matter of law, that a

defendant who has been declared insane by a physician, in accordance with standards and as the result of tests recognized and approved by his profession, is exempt from responsibility to the law for his acts, subsequently committed, because of the presumption of the continuance of the mental condition of the patient, at the time of the declaration to the time when the subsequent act was committed in this State. Such declaration, although made in the performance of official duty, can be no more conclusive than the opinion of a physician, given by him as a witness at the trial, that defendant is insane. It is evidence only to be submitted to the jury. The physician deals with his patient, solely, from the standpoint of the individual, while the courts, in administering the law, must consider the interests of society as well as of the individual. The physician would heal those who are sick, in mind as well as in body, and where the disease is, in his opinion, incurable, and may cause his patient to injure himself or others, his duty is to protect the individual as well as others by isolation and confinement only; the courts, however, are required to act upon the philosophy underlying the right and duty of the State to punish offenders against its laws, and thus not only undertake the reformation of the offender, but also endeavor to deter others from the commission of crime by the fear of like punishment. Whether or not a prior adjudication that a person is insane, within the meaning of the term "insanity," as defined by the law in this State, accompanied by the presumption of the continuance of such insanity, should be held to affect the rule as to the burden of proof upon the question of sanity, when involved in an issue of guilt or innocence of crime, alleged to have been subsequently committed by the person so adjudged insane, is not presented by this appeal.

It should be noted that defendant in this action, although contending that when he killed deceased he was insane because of an incurable mental disease, which is progressive in its nature, does not contend that he was insane at the time of his arraignment and trial. His plea was "not guilty"; not that he was unable to plead because of insanity. Dr. Anderson, superintendent of the State Hospital for the Insane, an admitted expert, whose long experience in his profession, and whose high personal character were doubtless considered by the jury, in passing upon the question of defendant's responsibility for his act, testified that in his opinion, while defendant is insane, because suffering from a disease known as dementia præcox of the paranoid type, he knew that his act in shooting deceased was wrong and unlawful, and would probably result in the death of Mr. King. This opinion is well sustained by facts and circumstances which the evidence tends to show.

We have examined all the numerous assignments of error appearing in this record. Counsel, assigned by the court to advise and aid defend-

ant upon the trial of the issue involving his life and death, have been diligent in the performance of their duty to him and to the court. However, we find no error upon this record. The charge of the court was full, accurate and correct; his instructions as to the law are fully supported by the authorities, and we must affirm the judgment. There is

No error.