State v. Musselwhite

STATE OF NORTH CAROLINA v. JIMMY MUSSELWHITE

No. 8116SC225

(Filed 6 October 1981)

1. **Assault and Battery § 15.7; Weapons and Firearms § 3— discharging firearm into dwelling—insufficient evidence of self-defense**

    In a prosecution for discharging a firearm into an occupied dwelling, the trial court did not err in failing to submit an issue of self-defense to the jury where the evidence showed that defendant was standing in a yard two houses away from the victims' dwelling when he heard a shot fired from such dwelling toward the house where he was standing, and that defendant then fired at the victims' dwelling, since there was no evidence that defendant was or reasonably believed himself to be in danger of death or great bodily harm.

2. **Criminal Law § 113.7— instructions on acting in concert**

    The trial court properly instructed the jury on the theory on acting in concert in this prosecution for discharging a firearm into an occupied dwelling where there was evidence tending to show that defendant and two companions were standing together at the scene of the incident and all were armed; after a shot was fired from the victims' dwelling, defendant and his companions all fired shots; a witness saw all three men fire shots at the dwelling but could not tell whose shots struck the dwelling; and defendant made conflicting statements as to whether he had fired into the dwelling or had fired only into the air.

    Judge BECTON dissenting.

APPEAL by defendant from *Battle, Judge.* Judgment entered 6 November 1980 in Superior Court, ROBESON County. Heard in the Court of Appeals 4 September 1981.

The defendant was indicted for discharging a firearm into an occupied dwelling in violation of N.C. Gen. Stat. § 14-34.1. He was found guilty in a jury trial and sentenced to three to five years imprisonment.

The evidence indicated that Carey Mae Tilley and members of her family, including Joanne Tilley, the defendant's estranged girl friend, were in their home on the evening of 13 July 1980. On that evening, shots were fired at the occupied dwelling, resulting in damage to the house. The defendant presented conflicting evidence as to whether he shot at the house, but he maintained that the initial gunshot came from the Tilley house.

*Attorney General Edmisten, by Associate Attorney Max A. Garner, for the State.*

*Appellate Defender Adam Stein and James H. Gold, for the defendant-appellant Jimmy Musselwhite.*

MARTIN (Robert M.), Judge.

The defendant's first assignment of error concerns the failure of the trial judge to submit to the jury the issue of self-defense. The trial judge is required to charge on self-defense, even without a special request, when there is some construction of the evidence from which could be drawn a reasonable inference that the defendant assaulted the victim in self-defense. *State v. Goodson,* 235 N.C. 177, 69 S.E. 2d 242 (1952); *State v. Lewis,* 27 N.C. App. 426, 219 S.E. 2d 554 (1975), *cert. denied,* 289 N.C. 141, 220 S.E. 2d 799 (1976). No construction of the evidence in this case supports such a charge.

Here the defendant is charged with discharging a firearm into an occupied dwelling. He was standing in the yard of a house two houses away from the Tilley dwelling. The defendant and his two companions were armed with guns and were drinking. The defendant alleges that the initial shot came from the Tilley house before he began firing his gun. Nowhere did the defendant's evidence indicate that he fired at anyone in order to save himself

from death or bodily harm. In his statement to the police following his arrest, the defendant stated in pertinent part:

I, Jimmy Musselwhite, fired a shotgun at the residence of Carey Mae Tilley and Joanne Tilley after someone at that residence had fired a shotgun, or what appeared to be pistol shots, in the direction of Richard Bass' residence, located at 155 "E" Avenue. I am not sure who fired the shots in that direction, but I do know that the shots came from the residence of Carey Mae Tilley.

At trial, the following testimony was elicited from the defendant on direct examination:

Q. All right, sir. Do you recall on the night of July 13th, whether you were fired at while at Richard Bass' house?

A. See, me and Joanne, we had an argument, and we was standing there, she cussed me and I cussed her, and then I must have stepped on some of them's feet, because I heard a pistol go off, and right there, there's a stump in front of the house, and there was a shotgun went off twice, and so when I looked—

COURT: Wait a minute. Did you hear a pistol or a shotgun?

WITNESS: Both of them. So, I reached and grabbed the shotgun and I shot up in the air, and Bimbo and Pete took the shotgun away from me.

We are in full accord with the sound principle of law on self-defense enunciated in *State v. Ferrell*, 300 N.C. 157, 265 S.E. 2d 210 (1980) and in *State v. Marsh*, 293 N.C. 353, 237 S.E. 2d 745 (1977). The facts in the case before us, however, do not invoke their application. In *Ferrell* the deceased and the defendant were in close physical proximity, as they were in the same room—not so here. In that case evidence that the deceased had a box cutter in his hand and had struck the first blow was sufficient to permit the jury to reasonably infer that the defendant acted in self-defense. Similarly, *Marsh* involved an exchange of gunfire at close range in which the victim allegedly shot at the defendant twice before the defendant returned fire. In the present case the defendant heard a gunshot, did not see who fired it, but never-

theless opened fire on a house, two houses away from where he was standing. The defendant testified that the initial shot was toward the residence of Richard Bass and that he returned fire, not at any particular person, but at the building itself. There is no evidence that the defendant was or reasonably believed himself to be in danger of death or great bodily harm. A jury could not reasonably infer that the defendant was acting in self-defense. Consequently, this assignment of error is overruled.

[2] The defendant also contends that insufficient evidence of acting in concert existed to support a jury instruction on that theory and furthermore that the instructions as given were erroneous.

Carey Mae Tilley testified that she saw the defendant and the two other men shooting at her house, but she could not tell which shots actually struck the dwelling. The defendant in one statement admitted to shooting into the house, while in court he only admitted to firing a shot into the air. The evidence supports the conclusion that all three men were together at the scene of the incident and that they all fired their guns. Without finding specifically that the shot from defendant's gun hit the house, the jury could find a common purpose to commit a crime and thus find the defendant guilty of acting in concert. Quoting Justice Exum in *State v. Joyner*, 297 N.C. 349, 356-57, 255 S.E. 2d 390, 395 (1979):

> Where the state seeks to convict a defendant using the principle of concerted action, that this defendant did some act forming a part of the crime charged would be strong evidence that he was acting together with another who did other acts leading toward the crimes' commission. That which is essentially evidence of the existence of concerted action should not, however, be elevated to the status of an essential element of the principle. Evidence of the existence of concerted action may come from other facts. It is not, therefore, necessary for a defendant to do any particular act constituting at least part of a crime in order to be convicted of that crime under the concerted action principle so long as he is present at the scene of the crime and the evidence is sufficient to show he is acting together with another who does the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime.

In *State v. Lovelace*, 272 N.C. 496, 158 S.E. 2d 624 (1968), two men, Dixon and Lovelace, were convicted of the felonious possession of implements of housebreaking. The tools were seen in the actual possession of Dixon only. Both men, however were observed at the entrance to a restaurant at 1:45 a.m. on a Sunday morning. The front door to the restaurant showed evidence of tool marks around the lock. This Court held that even if only Dixon had actual possession of the tools at the time the men were apprehended, "if the men were acting together in the attempt to use them to force entry into the restaurant, both in law would be equally guilty of the unlawful possession." *Id.* at 498, 158 S.E. 2d at 625. Concluding that the evidence was sufficient to find that the two men "were acting together," the Court, on Lovelace's appeal, affirmed his conviction.

In the case before us the evidence indicates that all three of these men were acting together pursuant to a common plan to fire gunshots at the Tilley dwelling. The testimony tended to show that the three men were together and armed immediately before the shooting occurred. Whether the defendant fired his gun into the air or at the house, someone in his group definitely fired the shots which damaged the building. The jury could find from the evidence that all of these men are equally guilty of the crimes committed by any one of them pursuant to their common purpose under the principles approved in *Lovelace* and *Joyner*.

The instructions on acting in concert given by the trial judge follow the instructions upheld in *State v. Joyner, supra.* These instructions were not unfavorable to the defendant. We, therefore, overrule defendant's assignments of error relating to the application of the concerted action theory.

Defendant's final assignment of error concerns the in-court testimony of Officer R. A. Grice. Officer Grice testified that Joanne Tilley had told him that the defendant had threatened to kill her. "It is well settled that with the exception of evidence precluded by statute in furtherance of public policy [which exception does not apply to this case], the failure to object to the introduction of the evidence is a waiver of the right to do so, and its admission, even if incompetent, is not a proper basis for appeal." 4 Strong's N.C. Index 3d, Criminal Law § 162, p. 825; *State v. Wilkins*, 297 N.C. 237, 254 S.E. 2d 598 (1979).

The defendant raised no objection at trial regarding the admissibility of this testimony and cannot be heard to raise this objection for the first time on appeal. *State v. Phelps*, 18 N.C. App. 603, 197 S.E. 2d 558, *cert. denied*, 283 N.C. 757, 198 S.E. 2d 727 (1973); *State v. Harrell*, 16 N.C. App. 620, 192 S.E. 2d 645 (1972); 4 Strong's N.C. Index 3d, Criminal Law § 162.2, p. 828. Consequently this assignment of error is without merit.

No error.

Judge MARTIN (Harry C.) concurs.

Judge BECTON dissents.

Judge BECTON dissenting.

While I hesitate to "adopt a rule of law which more easily justifies the taking of human life," *Commonwealth v. Johnston*, 438 Pa. 485, 493, 263 A. 2d 376, 381 (1970) (Pomeroy, J., dissenting), I dissent from the majority's resolution of defendant's self-defense claim. This is indeed a close case, but I believe the majority has usurped the jury's function. It finds that "there is no evidence that the defendant was or reasonably believed himself to be in danger of death or great bodily harm," *ante*, page 3, and concludes that "no construction of the evidence in this case supports [a self-defense] charge," *ante*, page 2. It may be wise, as a policy matter, to enact gun control legislation to reduce the number of "they shot first and I shot back to stop them from shooting" claims. And while it may be expedient, as a practical matter, for a defendant to run and take cover when "fired upon" from a house, I do not believe it to be the law in this State that before a defendant can "return fire," he has either (1) to flee or take cover; (2) to determine correctly who in a house is shooting at him; or (3) to specifically testify that the shots fired at him put him in fear of death or great bodily harm.[1] My belief is based on an historical analysis of the doctrine of self defense and the retreat rule.

---

1. *Compare Brown v. United States*, 256 U.S. 335, 65 L.Ed. 961, 41 S.Ct. 501 (1921). When one is feloniously assaulted, he is not required to "pause to consider whether a reasonable man might not think it possible to fly with safety, or to disable his assailant rather than to kill him." *Id.* at 343, 65 L.Ed. at 963, 41 S.Ct. at 502.

The high regard for the value of human life qualified the right, at common law, to defend oneself. Originally,' self-defense was not a defense to homicide; it could only be used in hopes of obtaining a pardon. 2 F. Pollock & F. Maitland, The History of the English Law, 479 (1895). Later, in England, an assaulted person was required to retreat (to the wall, fence, or ditch) if any avenue of escape was open, before resorting to deadly force. "[T]he colonies, however, while embracing the doctrine of self-defense, did not unanimously accept [this] retreat rule." Note, *Criminal Law—A Further Erosion of the Retreat Rule in North Carolina*, 12 Wake Forest Law Rev. 1093, 1095 (1976). Indeed, the retreat rule was, more often than not, rejected by Southern and Western states in which a strong code of personal honor developed. As stated by Professor Beale, "[i]n the West and South . . . it is abhorrent to the courts to require one who is assailed to seek dishonor in flight." Beale, *Retreat from a Murderous Assault*, 16 Harv. L. Rev. 567, 577 (1903).

As early as 1839, North Carolina required a defendant who was feloniously assaulted to retreat to the wall before killing in self-defense. *State v. Hill*, 20 N.C. 629, 34 A.D. 396 (1839). By 1876, North Carolina joined the majority of Southern states and held that one attacked with felonious intent was under no obligation to retreat. *State v. Dixon*, 75 N.C. 275 (1876); 12 Wake Forest Law Rev. at 1096. Our courts have created other exceptions to the retreat rule. If one is in his own home, he, in effect, has his back to the wall and is under no duty to retreat from an assault be it felonious or non-felonious. *State v. Johnson*, 261 N.C. 727, 136 S.E. 2d 84 (1964). This exception was later extended to include both the curtilage of the home as well as one's place of business. *See State v. Pearson*, 288 N.C. 34, 215 S.E. 2d 598 (1975).[2] In 1976, this Court went a step further and held that no duty to retreat from the home exists even if the assailant is another lawful occupant of the premises. *State v. Browning*, 28 N.C. App. 376, 221 S.E. 2d 375 (1976).

___

2. The Pearson court said: "These retreat rules ordinarily have no application, however, when a person . . . is attacked in his own dwelling, home, place of business, or on his own premises." 288 N.C. at 40, 215 S.E. 2d at 603.

State v. Musselwhite

While some question the soundness of our law,[3] our law is, nevertheless, unmistakably clear. The common law doctrine that the right of self defense does not arise until the person assaulted has retreated to the wall has been supplanted in this State by the following doctrine: If a person is assaulted in a place where he has a right to be, he may stand his ground, meet force with force, and if need be, kill his assailant. With this doctrine in mind, let us turn to the particulars of the case *sub judice*.

At page 2 of its opinion, the majority states part of the applicable law relating to self-defense instructions: "The trial judge is required to charge on self-defense, even without a special request, when there is some construction of the evidence from which could be drawn a reasonable inference that the defendant assaulted the victim in self defense." [Citations omitted.] Our courts, however, have said more. In resolving whether a self-defense instruction should be given, the facts are to be interpreted in the light most favorable to the defendant. *State v. Blackmon*, 38 N.C. App. 620, 248 S.E. 2d 456 (1978), *cert. denied*, 296 N.C. 412, 251 S.E. 2d 471 (1979). Further, the credibility of trial testimony is to be evaluated by the jury, *not the court. State v. Evans*, 19 N.C. App. 731, 200 S.E. 2d 213 (1973); *State v. May*, 8 N.C. App. 423, 174 S.E. 2d 633 (1970). Moreover, the reasonableness of a defendant's belief that he had to use self-defense is to be determined by the jury. As stated in *State v. Marsh*, 293 N.C. 353, 354, 237 S.E. 2d 745, 747 (1977) (emphasis added):

The right to act in self-defense rests upon necessity, real or *apparent*, and a person may use such force as is necessary or *apparently* necessary to save himself from death or great bodily harm in the lawful exercise of his right of self-defense. A person may exercise such force if he believes it to be necessary and has reasonable grounds for such belief. *The reasonableness of his belief is to be determined by the jury from the facts and circumstances as they appeared to the accused at the time.* [Citation omitted.]

---

3. "North Carolina, by continuing to erode the duty to retreat, fails to encourage resort to legal or other means to settle disputes." Note, *Criminal Law—A Further Erosion of the Retreat Rule in North Carolina*, 12 Wake Forest Law Rev. 1093 at 1100 (1976).

Significantly, the defendant was, and had been, living at a house diagonally across the street from the prosecution's witness' house at the time of the shooting; only one house was between the two houses. The State introduced defendant's post-arrest statement that he fired a shotgun at the prosecution's witness' residence only after gunshots were fired from the house at him. (The defendant, himself, testified that he heard a pistol shot in addition to the shotgun blasts before he returned the fire.) Relevant portions of the defendant's post-arrest statement are set out below:

> I, Jimmy Musselwhite, fired a shotgun at the residence of Carey Mae Tilley and Joanne Tilley *after someone at that residence had fired a shotgun,* or what appeared to be pistol shots, in the direction of Richard Bass' residence, located at 155 "E" Avenue. I am not sure who fired the shots in that direction, but "I do know that the shots came from the residence of Carey Mae Tilley. I had been having trouble with Joanne Tilley for the last few days. On Saturday, July 12, we had a big argument, and I took her car and drove it around the block and parked it in the yard of Richard Bass' house. I told her she could come get the car, but she called the police and told them I had stolen her car. I had been threatened and even shot at by some of the members of Joanne Tilley's family. They have harassed me and tried to make me do something that would send me back to prison. *I did shoot at her house Sunday night, but it was only after they had shot at us* in the yard of Richard Bass' residence. [Emphasis added.]

I am as concerned as the majority that the evidence indicates that defendant "opened fire on a house." The jury is free, however, to infer that defendant was not simply shooting at the structure itself, but rather was returning the fire in self-defense in an effort to stop the Tilleys from shooting at him. Our law seems to give defendant the right to repel a felonious assault in that manner.[4]

---

4. Whether a defendant who shoots into a home is culpably negligent is another question. It, too, is ordinarily a question for the jury. *State v. Church,* 43 N.C. App. 365, --- 258 S.E. 2d 812 (1979). Additionally, some courts suggest that the reasonableness of retreating or standing one's ground are circumstances which the jury may consider in deciding whether the right of self-defense exists. *State v. Haakenson,* 213 N.W. 2d 394 (N. D. 1973).

If the shooting occurred as the prosecuting witness suggests, there was no element of self-defense. This, however, the defendant denies. He contends that, while sitting under a tree at the place where he was then living, he was fired upon by someone from the prosecuting witness' house. As was said in *State v. Miller*, 223 N.C. 184, 187, 25 S.E. 2d 623, 625 (1943), a case involving both self defense and defense of the home:

> There is nothing in [his] testimony to indicate that [he] used any language calculated or intended to bring on the fight or that [he] otherwise provoked the difficulty. [He was] on [his] own premises. [He was] under no obligation to retreat. [Citations omitted.] If [he was] assaulted in the manner outlined by [him he] has a right to stand [his] ground and return blow for blow or shot for shot in [his] own necessary self-defense.

It is true that the defendant's post-arrest statement was different from his in-court testimony. That fact does not vitiate his self-defense claim, however. Again, the credibility of trial testimony is to be evaluated by the jury, not the court. *See State v. Evans* and *State v. Ferrell*, 300 N.C. 157, 265 S.E. 2d 210 (1980). In *Ferrell*, the State introduced at least three inconsistent statements of the defendant. One of Ferrell's statements suggested that his roommate, the victim, struck the first blow and also had a box-cutter in his hand prior to his death. In the face of three inconsistent statements made by him, Ferrell testified that he was in his room when his roommate was killed by some third person who escaped. The Court in *Ferrell* not only held that there was evidence from which a jury could find that Ferrell acted in the heat of passion upon sudden provocation so as to reduce the crime to voluntary manslaughter, but also held that the evidence was sufficient to permit the jury reasonably to infer that Ferrell acted in self-defense.

So, in view of the evidence (1) that defendant had been threatened by members of the Tilley family, (2) that defendant was on property where he lived when fired upon and had no duty to retreat, and (3) that shots were fired first at defendant from the Tilley residence before defendant returned the fire, the jury could have found, but were not required to have found, that the defendant was exercising his lawful right of self-defense. The trial

judge's failure to instruct on self-defense constituted prejudicial error. In my view, defendant is entitled to a

New trial.